IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARCI ANN BUTER,                    )
                                    )
              Plaintiff,            )          Civil Action No. 14-357
                                    )
     v.                             )
                                    )
CAROLYN W. COLVIN, COMMISSIONER     )
OF SOCIAL SECURITY,                 )
                                    )
              Defendant.            )

## OPINION

### I.  Introduction

Pending before this court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the claims of Marci Ann Butler ("Plaintiff" or "Claimant") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381 et. seq. Plaintiff argues that the decision of the administrative law judge ("ALJ") should be remanded to the Commissioner either for payment of disability on the current record or for further administrative proceedings and a decision which complies with prevailing legal standards because the ALJ's determination is not supported by substantial evidence.  To the contrary, Defendant argues that the decision of the ALJ is supported by substantial evidence, and therefore, the ALJ's decision should be affirmed. The parties have filed cross motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

For the reasons stated below, the Court will grant Defendant's Motion for Summary Judgment, and deny the Plaintiff's Motion for Summary Judgment.

## II. Procedural History

On February 24, 2012, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits and also filed a Title XVI application for SSI, (R. at 11), claiming that she became disabled and unable to work beginning January 13, 2012 (R. at 11). On May 16, 2012 the claims were denied (R. at 11). On June 26, 2012, Plaintiff filed a timely written request for a hearing. The hearing was held on May 23, 2013. Present at the hearing were Plaintiff, her attorney, A. Tereasa Rerko, and an impartial vocational expert ("VE") Irene H. Montgomery.

Based on evidence presented at the hearing, Administrative Law Judge, Marty R. Pillion issued an opinion on July 16, 2013. The ALJ found that the Plaintiff had the following severe impairments: obesity, ankylosing spondylosis, panuveitis of the right eye, chronic low back pain, lumbar facet syndrome, bilateral sacroiliitis, uveitis, idiopathic iritis, myopia, gastroenteritis, lumbago, lumbar disc degeneration without myelopathy, lumbar sprain/strain, HLAB27, lumbar radiculopathy, lumbar spondylosis, generalized anxiety disorder, depressive disorder, and sexual identity disorder (R. at 13). However, the ALJ determined that Plaintiff was not disabled under the SSA (R. at 22).

> The ALJ concluded that Plaintiff's impairments did not meet or medically equal one of the Listed Impairments found in the SSA, 20 C.F.R. Part 404, Subpart P, Appendix I, (R. at 14), and that Plaintiff had the Residual Functioning Capacity ("RFC") to perform sedentary work except she is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs, no climbing ladders, ropes, or scaffolds, frequent reach, handle, finger, and feel, no exposure to hazards such as heights or moving machinery, and no exposure to atmospheric conditions such as odors, dusts, gases, or poor ventilation beyond a level typically found in an indoor work environment such as an office or department store. Further, she can only perform tasks requiring occasional reading, and no work requiring binocular vision or depth perception, and is limited to simple routine, repetitive tasks and simple work-related decisions. (R. at 16)

On January 28, 2014 the Appeals Council denied Plaintiff's Request for Review making the ALJ's decision the final decision of the Commissioner (R. at 1-5). Plaintiff filed suit in this Court for judicial review of the Commissioner's decision. Presently before this Court are the parties' cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

### III. Medical History

The ALJ reported that the doctors' records used to evaluate claim were: Samuel E. D'Onofrio, University of Pittsburgh Physicians, UPMC Eye Center, Westmoreland Regional Hospital, V. Hema Kumar, M.D., and H. King Harman, Jr., M.D (R. at 101). In addition to these doctors, the record reflected that Plaintiff saw Dr. Malik at the UPMC Arthritis and Autoimmunity Center on a regular basis for epidural injections (R. at 230).

Plaintiff reported taking the following medications: 10 milligrams of escitalopram for depression, naproxen for bones, lorazepam for acid reflux, estradiol for transgenderism, Opana pain pills and Remicade for bones (R. at 39).

In the Disability Determination Explanation, Plaintiff advised the adjudicator that [s]he no longer believes that [s]he has a disabling mental impairment that prevents [her] from working (R. at 78). Furthermore, we found no substantive mental capacity reports on the record. Therefore, claims relating to mental incapacity will not be addressed in our opinion. Our opinion focuses on the Plaintiff's claims related to back pain and eye disease.

On November 10, 2010 Plaintiff had an office visit to her primary case physician, Dr. V. Hema Kumar, M.D. regarding a sore red eye with seepage (R. at 239). Dr. Kumar's impression was conjunctivitis (R. at 239).

On January 5, 2011 Plaintiff attended the Emergency Department of Excela Health Westmoreland Hospital complaining of eye problem of redness and pain. Plaintiff was diagnosed with acute conjunctivitis and was discharged with prescription eye drops (R. at 281).

On January 11, 2012 Plaintiff went to the Emergency Department of Excela Health Westmoreland Hospital with her eye problem. Plaintiff was experiencing a lot of pain and loss of vision (R. at 271). H. King Hartman, Jr., M.D. diagnosed Uveitis, NOS, Idiopathic iritis, Inflammatory pupillary membrane, posterior synedhiae, OD-Hypopyon, AC fibrin, and Myopia (R. at 259). Impression: Severe Panuveitis of the right eye (R. at 271). Plaintiff was referred to Samuel E. Donofrio by Dr. Hartman. Dr. D'Onofrio gave Plaintiff a guarded visual prognosis (R. at 313).

On January 30, 2012 Plaintiff had a physical examination with a diagnosis of musculoskeletal pain and strain (R. at 77). Plaintiff visited the Emergency Department at Excela Health Westmoreland Hospital with back or flank pain (R. at 263). Plaintiff was positive for right midline tenderness upon palpation but did not have limited range of motion and straight leg testing was negative (R. at 265). Diagnosis was probable sacrolitis (R. at 265). Plaintiff was given pain medication and discharged on the same day (R. at 270).

On February 23, 2012 Plaintiff saw Dr. Ashima Malik of the UPMC Arthritis and Autoimmunity Center for a physical exam. Plaintiff was diagnosed with severe disorders of the back – dicogenic and degenerative and non-severe loss of visual acuity (R. at 78). Diagnoses was Ankylosing Spondylitis and Sacroiliitis NEC (R. at 297). Dr. Malik reports that Plaintiff was found to have HLA-B27 +ve and sacro-ilitis on x-rays and she was referred to Rheumatology (R. at 297). Dr. Malik ordered the following plan: "-check hep B, hep C, esr, CRP and CCP. – get X-rays of neck/thoracic /and lumbar spine. – get CT scan of pelvis to see

extent of erosions so can compare in future. – increase dose of Indocin to 800mg TID scheduled with PPI for inflammatory pain. Continue t/t with nasaid's for next 1-2 months. If no response – will need Anti-TNF's. – start physical therapy or ROM and setting up a home exercise program." (R. at 300).

As stated above, Dr. D'Onofrio saw Plaintiff for a comprehensive ocular examination on January 11, 2012. Based on the examination he reports, "As for disability status. Patient will have great difficulty performing any work related tasks involving depth perception. Patient has little to no usable vision in her right eye. Driving, handling heavy equipment, etc. would not be recommended second to her current visual status." (R. at 313). However, On March 19, 2012 Dr. Samuel E. D'Onofrio provided a report which listed no other restrictions for Plaintiff (R. at 311-12).

On April 10, 2012 at CT of the pelvis and abdomen was performed on Plaintiff at Westmoreland Regional Hospital. Findings were generally unchanged and normal. It was only noted that there may be subtle sclerosis on iliac side of both SI joints (R. at 387).

On April 26, 2012 Plaintiff returned to Dr. Malik for back pain. Plaintiff reported pain and stiffness all day and unable to sleep at night. Plaintiff had 10 sessions with physical therapy which she reported did not provide any relief (R. at 691). Plaintiff also reported no improvement on ibuprofen or Naprosyn. Plaintiff has HLAb-27 associated spondyloarthropathy that failed to respond to nsaids (non-steroidal anti-inflammatory drugs) and conservative measures (R. at 693). The plan was to start Humira, and continue Naprosyn until they could get Anti-TNF's. Plaintiff was told to continue physical therapy for range of motion ("ROM") exercises (R. at 693).

April 30, 2012 Plaintiff saw Kelli Sarocky, PA-C for chronic low back pain. Plaintiff rated the pain at 7/10. Plaintiff was awaiting approval to begin Humira (R. at 686). "Patient was

significantly tender to even light palpation throughout lumbar spine and bilateral SI joints. No spasms noted." (R. at 688). Plaintiff was hesitant on ROM and ROM and straight leg raise aggravated the pain in the lower extremities bilaterally. Plaintiff had full ROM in lower extremities and strength testing is 5+/5. Patella and Achilles reflexes are 2+/4. Sensation is intact and equal across all dermatomal distributions (R. at 688). Doctor Sarocky recommended discontinuing use of naproxen and Ibuprofen due to ineffectiveness (R. at 688). Plaintiff was prescribed alternative medications of Meloxicam and Tramadol (R. at 688).

Plaintiff underwent a left SI injection on May 4, 2012 but she found no benefit (R. at 677). Dr. Michael Toshok administered the injection with an attempt for 50% pain reduction over the left sacroiliac region. Plaintiff reported a pain level of 6/10 on this day (R. at 683).

On May 8, 2012 Plaintiff attended Westmoreland Regional Hospital for a Bone Density Scan of the Spine and Hip to get a baseline reading (R. at 383). The scan was performed due to the diagnosis of ankylosing spondylitis. The Plaintiff's BMD was compatible with normal bone density (R. at 383). A comparison was performed of the spine to a January 21, 2009 study where degenerative disc status loss was minimal and osteophyte formation and minimal bilateral foraminal encroachment were seen at C5-C6 and C6-C7 (R. at 386). At the thoracic spine there was minimal marginal osteophyte formation and some mild anterior wedging of the T10 and T11 vertebral bodies (R. at 387).

May 16, 2012 Plaintiff returned to Dr. Sarocky, PA-C for a follow up visit for chronic low back pain. The pain was located about the cervical, thoracic, lumbar spine but was most significant along the lumbar spine. The pain does refer along both hips and the anterior inguinal areas. Plaintiff rated the pain as an 8/10 and states it occurs daily (R. at 680). Plaintiff said her pain is aggravated with all forms of motion and is interfering with her activities of daily living

(R.at 680). Plaintiff was undergoing physical therapy three times a week and finding no benefit (R. at 680). Dr. Sarocky ordered MRI of the lumbar spine and sought to obtain a back brace (R. at 682).

May 25, 2012 the Center for Medical Imaging performed an MRI of the lumbar spine. The study concluded that there was degenerative disc disease, no evidence of herniation, no evidence of any narrowing at any level, hypertrophic degenerative changes were seen involving the facet joints posteriourly at the L4-5 and L5-S1 level (R. at 779).

On June 4, 2012 Plaintiff visited Dr. Toshok again to receive pain treatment in the way of medications and injections (R. at 229). Plaintiff's pain was located in the cervical, thoracic, and lumbar spine but was most significant in the lumbar spine (R. at 677). Dr. Toshok reported the following test results:

> Patient was diagnosed with ankylosing spondylitis and testing revealed a positive HLA-B27. She did consult Dr. Malik, rheumatologist. He did order further testing. Cervical spine x-ray April 12, 2012 reveals degenerative disc stature loss, minimal osteophyte formation in minimal bilateral foraminal encroachment C5-C6 and C6-C7. Thoracic spine x-ray April 12, 2012 reveals minimal marginal osteophyte formation, mild anterior wedging at T10 and T11. Mild curvature convex to the right. Lumbar spine x-ray April 12, 2012 reveals bilateral L5 spondylolysis is questioned to be present. MRI lumbar spine from May 25, 2012 indicates degenerative changes involving the facet joints at L4-5 and L5-S1 levels. There is no evidence of any disc protrusion or disc herniations no foraminal significant narrowing noted at any levels hemangiomas seen at L2 vertebral body level. (R. at 677)

> Dr. Toshok's examination revealed:

> Plaintiff is moderately tender to palpation throughout cervical and thoracic spine. No spasms noted throughout the thoracic or lumbar region at this time. She has hesitant cervical and lumbar ROM as all forms of ROM aggravate her pain complaints, under fluoroscopy diffuse discomfort with facet lading from the L4-5 through L5-S1 levels bilateral slightly worse on left no radicular symptoms. She has full ROM lower extremeities and strength testing is 5+/5. Sensation is intact and equal across all dermatomal distributions. (R. at 678)

Dr. Toshok's notes of June 19, 2012 indicate that he had a conversation with Dr. Malik, Plaintiff's Rheumatology fellow. Plaintiff had ongoing complaints about lower lumbar pain despite intra-articular facet injections. Dr. Malik recommended a repeat injection. Dr. Toshok commented if there is no improvement he would recommend discontinuing injections (R. at 676). Dr. Toshok recommended a lumbar support brace and muscle stimulation but not likely these devices would be approved by Plaintiff's health care (R. at 676). Aqua physical therapy in a therapeutic pool was another option presented to Plaintiff (R. at 676). A final consideration was an implantable morphine/Dilaudid pump (R. at 679).

On June 18, 2012 Plaintiff went to the Westmoreland Hospital for acute pelvic pain. The condition was diagnosed as acute exacerbation of chronic low back and bilateral hip pain (R. at 396). Plaintiff was discharged with pain medication on the same day. Comparison x-rays of the lumbar spine were performed and there were no significant changes from April, 2012 (R. at 405).

June 29, 2012 Plaintiff attended DNA – Mount Pleasant Surgery Center for back pain. Plaintiff was taking opioid analgesics and reported 50% relief from medication. Plaintiff described her symptoms as severe or worsening. Her symptoms are exacerbated by weight bearing, back motion, standing, sitting, prolonged standing, prolonged sitting, lifting, bending, straining and supine position (R.at 763). Plan was to schedule Plaintiff for injections and give her a short script of Percocet (R. at 765).

July 12, 2012 Plaintiff attended DNA – Mount Pleasant Surgery Center for performance of diagnostic and therapeutic interventions to assist with pain management and increase overall level of function (R. at 767). On this same day Plaintiff, once again, visited the Emergency Department of Excela Health Westmoreland Hospital complaining of back or flank pain. The final impression was back pain due to epidural (R. at 416). They performed a CT lumbar

contrast x-ray and found a small central disc bulge at L5-S1. There is a small amount of air in the paraspinous muscles and subcutaneous fat posterior to L5 and S1 (R. at 427). Plaintiff was provided with pain medication and released.

July 26, 2012 Plaintiff attended DNA – Mount Pleasant Surgery Center for a recheck of back pain after an injection procedure. Plaintiff requested no more injections after she had a CT scan done at the emergency room and they found an air pocket in her spine. She was getting no relief from injections. Her pain level was a 9/10 and she requested pain medication (R. at 760).

August 21, 2012 Plaintiff underwent a lumbar epidural steroid injection for her lumbar intravertebral disk disorder at the Aestique Ambulatory Surgical Center (R. at 787).

September 4, 2012 Plaintiff had a lumbar epidural steroid injection at Aestique Ambulatory Surgical Center (R. at 786).

September 6, 2012 Plaintiff attended DNA – Mount Pleasant Surgery Center for a recheck of back pain after an injection procedure. Plaintiff had no relief from pain after injection. She had nausea and vomiting, left leg was numb and tingling and foot and toes were cramping (R. at 757). Plaintiff went to the emergency room to address the symptoms. Plaintiff reported no relief in pain but did note increased weakness (R. at 757). An MRI was ordered because of Plaintiff's reported numbness and tingling and difficulty weight bearing (R. at 757).

September 11, 2012 the Center for Medical Imaging performed multiple pulse imaging sequences of the lumbar spine. It was concluded that there were mild degenerative changes, questionable small issue in the annulus fibrosis at L4-L5 but no significant compromise of the thecal sac or the existing nerves at L5-S1 (R. at 775).

September 13, 2012 Plaintiff attended DNA – Mount Pleasant Surgery Center for a recheck of back pain after a procedure. Plaintiff said she had no relief from injection and her pain level was at 9/10 (R. at 753).

September 28, 2012 Plaintiff attended DNA – Mount Pleasant Surgery Center for a recheck following a change in medication. Plaintiff showed same pain patterns and described the pain as sharp and stabbing. She reported her pain level as 8/10 but said she felt relief with heat (R. at 750).

October 14, 2012 Plaintiff attended the Emergency Room once again for back pain. Impression was chronic back pain (R. at 670). Plaintiff was discharged with a pain prescription (R. at 670).

October 16, 2012 Plaintiff attended DNA – Mount Pleasant Surgery Center for a follow up after a procedure. Plaintiff reported she had no relief from injection (R. at 746). Plaintiff indicated pain in her pelvic low back area and left leg numbness. She also noted weakness in her left leg. Pain level was reported as 10/10 (R. at 746).

November 6, 2012 Plaintiff had a Left sided L3, L4, L5, S1 facet nerve block at Aestique Ambulatory Surgical Center (R. at 785).

November 20, 2012 Plaintiff had a left sided L3, L4, and S1 facet nerve block at Aestique Ambulatory Surgical Center (R. at 784).

December 13, 2012 Plaintiff attended DNA – Mount Pleasant Surgery Center for a recheck of back pain. Plaintiff was taking Opana ER and did find some relief but stated that the cold weather made her pain worse and she could not get out of bed on Monday because of the pain. She was also having a lot of trouble sleeping (R. at 742). She felt numbness in her legs

and feet and weakness in her left leg (R. at 742). She had a sharp stabbing pain in her low back and leg (R. at 742). She rated the pain as a 9/10 (R. at 742).

December 18, 2012 Plaintiff had a right sided L3, L4, L5, and S1 medial branch block at Aestique Ambulatory Surgical Center (R. at 783).

January 15, 2013 Plaintiff had a L3-S1 facet nerve block on the right side at Aestique Ambulatory Surgical Center (R. at 782).

February 14, 2013 Plaintiff attended DNA – Mount Pleasant Surgery Center for a follow up after an injection procedure. Plaintiff said pain had improved by 50% and she is at a 5/10 pain level. She described her pain as a dull ache (R. at 738). Plaintiff exhibited tenderness. Plaintiff's modified straight leg raising test is positive. Patrick and straight leg test on right and left is negative. Plaintiff had a painful gait and was favoring her left leg. Plaintiff had pain on flexion, pain on extension and decreased and limited ROM (R. at 740).

February 19, 2013 Plaintiff had a left sided L3, L4, L5, S1 Radiofrequency Rhizotomy of the left lower lumbar fact joints at Aestique Ambulatory Surgical Center (R. at 781).

March 19, 2013 Plaintiff had a left sided L3, L4, L5, S1 Radiofrequency Rhizotomy of the left lower lumbar fact joints at Aestique Ambulatory Surgical Center (R. at 780).

April 2, 2013 Plaintiff attended DNA – Mount Pleasant Surgery Center for a recheck of back pain. Her symptoms included pain, stiffness, and decreased range of motion. The pain radiated to Plaintiff's lower extremities. Plaintiff reported she did not get any relief from Rhizotomy and believed the pain to be worse now. She reported the pain as a 10/10. She did not find the medication to give her relief and she only had one hour of sleep the night before due to pain (R. at 734). Plaintiff's modified straight leg raising test was positive. Patrick and straight

leg test on right and left was negative. Plaintiff had a painful gait and was favoring her left leg. Plaintiff had pain on flexion, pain on extension and decreased and limited ROM (R. at 736).

May 2, 2013 Plaintiff presented at DNA – Mount Pleasant Surgery Center after Cryo/Rhizo (Left L3, L4, L5, S1 Rhizo done under sedation at Aestique. Pain had improved but was still rated at 6/10 by Plaintiff. Plaintiff also reported that medication Opana has helped with pain (R.at 730). Examination of Plaintiff found her to have facet tenderness on right and left and medial low back. Her sensation was diminished (R.at 730). Her modified straight leg raising test was positive (R. at 730). Plaintiff was to continue current treatment and medications and was not to engage in prolonged sitting or standing (R.at 730).

May 24, 2013 Plaintiff attended an appointment with Brinda Navalgund, MD for an elecrodiagnostic evaluation due to numbness from hip to toe on her left side (R. at 768). Plaintiff reported her symptoms of numbness, tingling, and weakness involving the left lower extremity to be constant (R. at 768). Upon examination Dr. Navalgund noted that there was no edema or atrophy and range of motion was normal, motor exam was normal and straight leg raise was negative (R. at 769). Plaintiff did not tolerate the testing and requested termination prior to completion. No diagnostic results were obtained (R. at 769).

On July 27, 2014 Plaintiff returned to the Emergency Department complaining of back pain and requesting a medication refill (R. at 430). Plaintiff's pain was at the bilateral and lower lumbar area (R. at 431). Plaintiff was advised to see her primary care physician for medication.

### *IV. Summary of Testimony*

Plaintiff reported her daily routine as:

> I get up, and I, kind of, stretch out my body to see, you know, what I can do. I go into the bathroom, have my routine in there. Go downstairs, let the dog out to go to the bathroom, feed the dog, feed the cat, get something light to drink, and sit

down on the chair and on the heating pad after I've taken my medications. And then figure out what I need to do for the day.

And then it always insists [sic] me, several times a day, having to lay down and rest my back. That will be lay down on the couch. That may include a nap of about an hour and a half to two hours. Then I try to move around a little bit more and get something to eat. Like I said, it's quick – in the microwave out of the microwave on small plates so I don't have to carry a big place because of the heaviness of it. (R. at 50)

Plaintiff's past work included accounts specialist, cab driver, production worker, intake worker/scheduler, Verizon technician, appointment/scheduler position, collections' agent, customer service representative, and merchandiser (R. at 60-61). Her last known position was as as a cab driver and she was discharged in November 2011 during the probationary period (R. at 31). Plaintiff was later diagnosed with HLA-B27, a rare disease of the eye and ankylosing spondylitis in January of 2012 (R. at 31).

At the state agency's request, Dr. Paul Reardon reviewed the record and evaluated the Plaintiff's Physical RFC and listed the following exertional limitations: occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk about 6 hours in an 8 hour work day, sit for about 6 hours in an 8 hour work day, push and pull capabilities are unlimited, occasional climbing ramps/stairs, ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching, and crawling (R. at 80). Plaintiff's visual limitations are right eye vision in all respects is limited (R. at 81). Plaintiff is to avoid extreme heat and cold, wetness, humidity, vibration, and fumes, odors, dusts, gases and poor ventilation (R. at 81). Plaintiff should avoid moderate exposure to hazards such as machinery or heights (R. at 82). "Based on the evidence of record, the claimant's statements are found to be partially credible." (R. at 82). Dr. Reardon relied on the opinion of Samuel E D'Onofrio, O.D., an optometrist who stated that Plaintiff is limited in seeing and driving and that she should avoid exposure to moving machinery (R. at 82).

At the hearing the ALJ took into account the Plaintiff's medical history, RFC, and her work history and asked the VE to consider an individual with the same work experience as Plaintiff who is limited to light work and who can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. The individual cannot climb ropes, ladders, or scaffolds. The individual can frequently reach, handle, find, and feel. The individual cannot tolerate exposure to hazards such as heights or moving machinery. The individual cannot tolerate exposure to weather, extreme heat or cold, wetness, or humidity. The individual cannot tolerate exposure to atmospheric conditions, such as dust, fumes, odors, smoke, or poor ventilation beyond a level typically found in an indoor work environment, such as an office setting or department store. The individual can only perform tasks that require reading occasionally (R. at 62).

The VE responded that such an individual as Plaintiff would be precluded from performing past work (R. at 62). The VE reported that the Plaintiff would be able to perform light unskilled positions such as weigher scales operator, collator position such as printing and publishing, inspector, and ticketer, or marker; these types of positions are available in the national economy (R. at 62-63).

### V. Standard of Review

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. See 42 U.S.C. § 405(g)(2012). This Court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v.

Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. See id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. 5 U.S.C. § 706(1)(F) (2012).

## VI. Discussion

Under SSA, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ..." 42 U.S.C. §§ 416(i)(l); 423(d)(1)(A); 20 C.F.R. § 404.1505 (2012). A person is unable to engage in substantial activity when:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled under SSA, a five-step sequential evaluation process must be applied. See 20 C.F.R. § 404.1520; McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows: At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i). At step two, the Commissioner must determine whether the claimant has a

severe impairment. See id. at § 404.1520(a)(4)(ii). If the Commissioner determines that the claimant has a severe impairment, he must then determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, subpart p, Appx. 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent him from performing his past relevant work. See id. at § 404.1520(a)(4)(iv). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering his residual functional capacity and age, education and work experience. See id. at § 404.1520(a)(4)(v); see also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

Before considering step four of the sequential evaluation process, the ALJ must first determine the claimant's residual functional capacity ("RFC") (R. at 12). An RFC is an individual's capacity to do physical and mental work activities on a sustained basis despite limitations from her impairments (R. at 12). The ALJ found the claimant to have the following severe impairments:

> [O]besity, ankylosing spondylosis, panuveitis of the right eye, chronic low back pain, lumbar facet syndrome, bilateralsacroiliitis, uveitis, idiopathic iritis, myopia, gastroentreritis, lumbago, lumbar disc degeneration without myelopathy, lumbar sprain/strain, HLAB27, lumbar radiculopathy, lumbar spondylosis, generalized anxiety disorder, depressive disorder, and sexual identity disorder (20 C.F.R. §§ 404.1520(c) and 416.920(c)). (R. at 13).

In this case, The ALJ determined that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (R. at 14). However, based on her impairments the ALJ did find that the Plaintiff is unable to perform her past relevant work (R. at 20).

The Commissioner, moving forward, uses the sequential evaluation process and determined at step (5) that the Plaintiff has not met her burden of proof that she cannot work in some capacity in the national economy. The Commissioner relied on the ALJ's determination that despite the Plaintiff's impairments, Plaintiff retained the capacity to perform sedentary work with various limitations that limited her to simple, routine, repetitive tasks and simple work-related decisions (R. at 16).

The ALJ also determined the Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible (R. at 17).

> After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform sedentary work except she is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs, no climbing ladders, ropes, or scaffolds, frequent reach, handle, finger, and feel, no exposure to hazards such as heights or moving machinery, and no exposure to atmospheric conditions such as odors, dusts, gases, or poor ventilation beyond a level typically found in an indoor work environment such as an office or department store. Further, she can only perform tasks requiring occasional reading, and no work requiring binocular vision or depth perception, and is limited to simple routine, repetitive tasks and simple work-related decisions. (R. at 16).

Based on the VE's testimony, the ALJ found that considering the Plaintiff's age, education, work experience, and residual functional capacity, the Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy (R. at 22).

The Plaintiff disagreed with the ALJ's determination. The claimant bears the burden of proving not only that he has an impairment expected to result in death or last continuously for a year, but also that it is so severe that it prevents her from performing any work  See 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); Bowen v. Yuckert, 482 U.S. 137, 147 (1987).  This requires the Plaintiff to prove that her RFC or limitations are that which do not allow for any work in the

national economy. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Matthews v. Eldridge, 424 U.S. 319, 336 (1976). Moreover, the ALJ is not required to uncritically accept Plaintiff's complaints. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011). The ALJ, as fact finder, has the sole responsibility to weigh a claimant's complaints about his symptoms against the record as a whole. See 20 C.F.R. §§ 404.1529(a), 416.929(a).

In support of her Motion for Summary Judgment and Brief [ECF Nos. 9 and 10], the Plaintiff argues that the ALJ's decision does not address the criteria set forth in Listing 14.09 for ankylosing spondylitis [ECF No. 10 at 9]. Plaintiff further asserts that the ALJ's medical findings run contrary to the evidence of record provided by treating physicians [ECF No. 10 at 9]. In particular, Plaintiff states that the ALJ discounted medical records provided by treating rheumatologists and pain specialists [ECF No. 10 at 10]. Plaintiff notes that the ongoing regular doctor appointments that Plaintiff is required to attend will cause her to miss a great amount of work [ECF No. 10 at 10]. Finally, Plaintiff takes issue with the ALJ's use of the Plaintiff's daily activities to determine Plaintiff's credibility [ECF No. 10 at 10]. The Third Circuit has established that activities such as school, hobbies, housework, social activities, travel or use of public transportation cannot be used to show an individual's ability to engage in substantial gainful activity. See Frankenfield v. Bowen, 861 F.2d 405 (3d Cir. 1988).

The Plaintiff also asserted that the ALJ failed to adequately cross-examine the VE regarding the duration of sitting and standing in a sedentary position [ECF No. 10 at 12]. The Plaintiff asserted that she could not tolerate the sitting and standing requirements of a sedentary position (R. at 71). We disagree with Plaintiff's assertion outright. The ALJ asked appropriate questions that caused the VE to clearly state that the ability to perform work at a sedentary level is not compromised by a restriction or limitation on sitting or standing (R. at 70).

In response to the Plaintiff's assertion regarding the review of Listing 14.09C, the Commissioner, in her Brief in Support of Motion for Summary Judgment [ECF No. 12 at 13] admits to the absence of the ALJ's review of ankylosing spondylitis under Listing 14.09 for inflammatory arthritis. However, the Commissioner states that the Plaintiff failed to proffer any evidence to establish that her impairment met or medically equaled Listing 14.09C to cause the ALJ to conduct such a review [ECF No. 12 at 13]. Nevertheless the Commissioner performed the evaluation in her Brief and found that the Plaintiff's condition as represented on the record does not satisfy the requirements as described in 14.00D [ECF No. 12 at 15].

The Plaintiff's second assertion that the ALJ discounted the medical records of Plaintiff's treating physicians. We disagree. In the ALJ's Decision of July 16, 2013 he reviews the objective medical evidence in the course of his finding of the Plaintiff being partially credible (R. at 17-18). In fact, the ALJ notes the Plaintiff's emergency room visits, her epidural injections, and the physical examinations and the findings and impressions of these various treatments with regard to Plaintiff's musculoskeletal pain and vision problems (R.at 18). The ALJ also noted the weak objective evidence of record to support a finding that Plaintiff is unable to work at any occupation available in the economy (R. at 20). The Commissioner further substantiates the ALJ's determination when noting that only "mild degenerative changes" were noted in diagnostic testing and that "impressions revealed intact vertebral bodies, intact posterior elements, intact odontoid process, normal alignment, and only minimal osteophyte formation and minimal foramine encroachment." [ECF No. 12 at 16]. In general, we found the balance of the Plaintiff's medical testing was normal or reported minimal abnormalities. It is our opinion that the ALJ, in providing his scenario to the VE took into account the medical record in its entirety including medical narrative by treating sources, Plaintiff narrative, and objective medical

findings and came to a reasonable conclusion regarding Plaintiff's disabled status. Any additional evidence from rheumatologists and pain specialists on the record was simply that have procedure for injections without commentary on Plaintiff's condition or capabilities.

Both the ALJ and the Commissioner noted evidence of the Plaintiff's daily activities. Namely, the ALJ states, "The claimant reported that she had some difficulty dressing and bathing, but she prepared her own meals, cleaned, did the laundry, drove a car, went out alone, went shopping in stores, paid bills, watched television, spent time with others, went to church, and attended social group." (R. at 19) [ECF No. 12 at 21]. We agree with Plaintiff that evidence of daily activities cannot be used to show an individual's ability to engage in substantial gainful activity. "Performing household chores is very different from working eight hours a day in a labor-intensive job." Stroman v. Astrue, 2009 U.S. Dist. LEXIS 10491, 147 SSR 73 (Nov. 4, 2009). However, we do believe activities of daily living are relevant and may be considered in evaluating a claimant's symptoms. See 20 C.F.R. § 416.929(c)(3)(i). We believe that the ALJ gave adequate consideration to Plaintiff's daily life activities in relation to other facts on record and her ability to work.

With regard to the ongoing medical appointments cited by Plaintiff's counsel, we are in agreement the Commissioner that there is no substantive information to support that Plaintiff's medical appointments would be such that they would interfere dramatically with her ability to maintain a job [See ECF No. 12 at 24]. Any intimation that Plaintiff's medical appointments would inhibit the Plaintiff's ability to work is pure speculation and not a proper basis on which to award disability benefits.

## VII.  *Conclusion*

For the foregoing reasons, we conclude that there is substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Plaintiff's Motion for Summary Judgment is denied.  The Defendant's Motion for Summary Judgment is granted.  An appropriate order will be entered.

Date:  *Sept. 26, 2014*

Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc:    counsel of record